IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ESSA BANK & TRUST and ESSA BANCORP, INC., | : : : | |
| Plaintiff, | : : | Civil Action |
| v. | : : | No. 23-cv-03447 |
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, | : : : | |
| Defendant. | | |

## MEMORANDUM

J. Younge                                                                                                               April 4th, 2025

### I.    INTRODUCTION

Currently before this Court are Defendant Travelers Casualty and Surety Company of America's Motion for Summary Judgment (ECF No. 26)[1] and Plaintiff Essa Bank & Trust, ESSA Bancorp, Inc.'s Motion for Summary Judgment (ECF No. 23 and 24). The Court finds these Motions appropriate for resolution without oral argument. Fed. R. Civ. P. 78; L.R. 7.1(f). For the reasons set forth in this Memorandum, the Plaintiff's Motion is Denied, and the Defendant's Motion is Granted.

### II.    FACTUAL BACKGROUND

Eagle National Bancorp, Inc., and Eagle National Bank (collectively, "Eagle") merged into ESSA Bank & Trust and ESSA Bancorp, Inc., (collectively, "ESSA") in 2015. ESSA is comprised of a bank and a bank holding company in Pennsylvania. (Complaint, ¶ 2, p.7, ECF No. 3.) Defendant Travelers Casualty and Surety Company ("Travelers") is a Connecticut based

---

[1] When applicable, the Court adopts the pagination supplied by the CM/ECF docketing system, which does not always match the document's internal pagination.

insurer, that provided an excess policy to Plaintiffs. ESSA, as the successor to Eagle, now brings this declaratory action seeking liability insurance coverage under the excess policy. ESSA further alleges that Travelers acted in bad faith by denying coverage for pending lawsuits brought against ESSA. (Complaint, ¶ 2, p.7, ECF No. 3)

Traveler's Excess Policy was effective from May 28, 2014, to May 28, 2015 ("2014 Excess Policy"), and contained an aggregate limit of liability of 2.5 million, which was excess of the coverage of the Primary Policy with Chubb.  (Defendant's Statement of Undisputed Facts ("Def. SUMF") ¶ 5, ECF No. 26-3). The BPL ("Bankers Professional Liability") Insuring Agreement ("Agreement") in the Primary Policy provided the scope of coverage. In Section 7.e., the Agreement provided that:

> All Related Claims shall be treated as a single Claim first made on the date the earliest of such Related Claims was first made or on the date the earliest of such Related Claims is treated as having been made in accordance with Subsection 8 below, regardless of whether such date is before or during the Policy Period.

(Def. SUMF at ¶ 9.)

The Primary Policy defined related claims as those arising from the same set of related facts, circumstances, or events. Section 8 of the Primary Policy concerns the Reporting and Notice requirements which state:

> a. The Insured shall, as a condition precedent to exercising any right to coverage under this Coverage Section, give to the Company written notice of any Claim no later than:
>
> (1) if this Coverage Section expires and is renewed with the Company, one hundred and eighty (180) days after such expiration; provided that, if the Parent Organization can prove to the Company's satisfaction that it was not reasonably possible for the Insured to give such notice within the one hundred and eighty (180) day time period and that subsequent notice was given as soon as reasonably possible thereafter, the Company shall waive the foregoing time period.

> (2) if this Coverage Section expires (or is otherwise terminated) without being renewed with the Company and if no Extended Reporting Period is purchased, sixty (60) days after the effective date of such expiration or termination, or
>
> (3) the expiration date of the Extended Reporting Period, if purchased;
>
> provided that, if the Company sends written notice to the Parent Organization stating that this Coverage Section is being terminated for nonpayment of premium, the Insureds shall give to the Company written notice of such Claim prior to the effective date of such termination.
>
> b. If during the Policy Period an Insured:
>
> (1) becomes aware of circumstances which could give rise to a Claim and gives written notice of such circumstances to the Company, or
>
> (2) receives a written request to toll or waive a statute of limitations applicable to Wrongful Acts before or during the Policy Period and gives written notice of such request and of such alleged Wrongful Acts to the Company,
>
> then any Claim subsequently arising from the circumstances referred to in (1) above, or from the Wrongful Acts referred to in (2) above, shall be deemed to have been first made during the Policy Period in which the written notice described in (1) or (2) above was first given by an Insured to the Company, provided any such subsequent Claim is reported to the Company as set forth in Subsection 8(a)(1) above. With respect to any such subsequent Claim, no coverage under this Coverage Section shall apply to loss incurred prior to the date such subsequent Claim is actually made.
>
> c. The Insured shall, as a condition precedent to exercising any right to coverage under this Coverage Section, give to the Company such information, assistance, and cooperation as the Company may reasonably require and shall include in any notice under Subsections 8a or 8b, a description of the Claim, of the alleged or potential damage, the names of all actual or potential defendants, and the manner in which such Insured first became aware of the Claim, circumstances, or request.

(Def. SUMF at ¶ 11.)

Travelers' Excess Policy was drafted on a claims made basis and only covered excess claims made during the policy period. (Def. SUMF at ¶ 13.) The Excess Policy further provides:

> SECTION 6. NOTICE
>
> A. The Insured(s) shall, as a condition precedent to their rights under this policy, give the Insurer notice in writing of any claim or loss in the same time and manner required by the terms and conditions of the Followed Policy. Notice given under the Followed Policy or Underlying Insurance shall not constitute notice under this policy.
>
> B. Notice to the Insurer of any claim, loss or circumstance shall be given as set forth in Item 9 of the Declarations.

(Def. SUMF at ¶ 14.)

Item 9 of the Declarations states:

> ALL NOTICES OF CLAIM OR LOSS MUST BE SENT TO [TRAVELERS] BY EMAIL, FACSIMILE OR MAIL AS SET FORTH BELOW:
>
> Email: bfpclaims@travelers.com
>
> FAX: (888) 460-6622
>
> Mail: Travelers Bond & Financial Products Claim
> 385 Washington St. – Mail Code 9275-NB03F
> St. Paul, MN 55102

(Def. SUMF at ¶ 15.)

On January 28, 2015, Vickie, and Edward Fangman ("Fangman Action") served Eagle with a complaint filed in the United States District Court of Maryland. The Fangman plaintiffs alleged that Eagle and other banking institutions referred mortgage customers to title insurance agents in exchange for monetary and non-monetary kickbacks. (Def. SUMF at ¶¶ 16-17.) Upon receiving notice of the Fangman Action, Eagle promptly notified its insurance broker, McGriff Insurance Services ("McGriff"). On February 13, 2015, McGriff provided notice of the Fangman Action to Chubb in accordance with the specific policy directions. However, notice of the Fangman Action was **not** provided to the Travelers claim department as per the Excess Policy directions. (Def. SUMF at ¶¶ 19-20.) In April 2015, Chubb sent a letter to Eagle with

instructions to notify all insurers whose policies may have been triggered. (Def. SUMF at ¶ 22). In 2015, Eagle renewed its Primary and Excess Policy, for a claims made Policy Period of May 28, 2015, to May 28, 2016 ("2015 Excess Policy"). (Def. SUMF at ¶ 23). In August 2015, Eagle announced that it was being acquired by ESSA. In October 2015, ESSA contacted McGriff to inquire about purchasing "runoff[2]" insurance for Eagle, but ultimately only decided to do so with respect to the Eagle's Directors and Officers. (Def. SUMF at ¶¶ 22-24.) ESSA explicitly declined obtaining "runoff" coverage for any post-acquisition BPL claims. On December 5, 2015, ESSA completed acquisition of Eagle, and the 2015 Primary and Excess Policies were accordingly cancelled on that date. (Def. SUMF at ¶¶ 26-28.) This cancellation marked the end of that policy and the coverage it provided from May 28, 2015, to December 5, 2015. ESSA's Executive Vice President and Chief Financial Officer, Mr. Allan Muto received details regarding the policy cancellation and returned premium information for the 2015 Excess Policy. (Consolidated Exhibits in Supp. Of Plaintiff's Mot. for SJ, p. 4, Exhibit 4, ECF No. 25.)

Two years later, on January 3, 2017, ESSA notified Chubb and Travelers Claim Departments of a second pending suit against ESSA by Plaintiff Edmondson ("Edmondson Action"), involving the same type of illegal banking schemes that were alleged in the Fangman Action. (Def. SUMF at ¶ 32.) On January 24th 2017, Travelers acknowledged receipt of the notice but proceeded to issue a letter declining coverage. Travelers explained that coverage was declined under the 2015 Excess Policy because notice of this action was provided more than a year following the termination of ESSA's Excess Policy. (Def. SUMF at ¶ 35-37.) On April 23, 2018, Chubb sent a letter acknowledging coverage for the Edmonson Action, and determining

---

[2] Runoff insurance protects businesses or individuals from liabilities related to past actions even after they have stopped active involvement in their profession or business; it is typically triggered by events such as mergers acquisitions or retirement.

that this claim would be considered a "Related Claim" given its similarity to the Fangman Action. Chubb clarified in the letter to ESSA that the Edmonson Action would be treated as a single "Claim" first made when it was notified of the Fangman Action. (Def. SUMF at ¶ 38.)

In June 2020, ESSA provided notice to Chubb's claim departments of a third lawsuit, the Wilson Action, involving the same allegations contained in the Fangman and Edmonson Actions. (Def. SUMF at ¶ 40). The primary insurer, Chubb, acknowledged that coverage for the Wilson Action would be considered a "Related Claim" and treated as a single Claim (when the claim for the Fangman Action was first asserted). (Def. SUMF at ¶ 48.) ESSA also provided notice to Travelers claim department. The Travelers claim department acknowledged receipt but requested information about the relevant policy. (Def. SUMF at ¶ 42.) Mr. Muto, Executive Vice president and CFO of ESSA, replied identifying the Traveler's 2015 Excess Policy as the relevant policy. Traveler's assigned claim handler, Ms. Jessica Ringgenberg, then reached out to Mr. Muto posing several questions regarding ESSA's primary coverage. (Def. SUMF at ¶ 44.) In July 2020, Travelers sent a letter to ESSA again declining coverage for the Wilson Action, because the Claim asserted against the bank was not made during the 2015 Policy Period. (Def. SUMF at ¶ 45.)

In May 2021, Chubb's payment of Defense Costs for the Fangman, Edmondson, and Wilson Actions exhausted the ESSA's Primary Policy limit. (Def. SUMF at ¶ 49.) A month later, Chubb sought confirmation from ESSA of whether or not the bank had excess coverage above Chubb's 2014 Primary Policy, and if that carrier was on notice for Edmondson and Wilson Actions. (Def. SUMF at ¶ 50.) In turn, ESSA asked McGriff to provide copies of any policies issued to Eagle in 2014-2015. In September, McGriff provided ESSA with copies of the 2014 Primary and Excess Policies. (Def. SUMF at ¶¶ 51-52.)

On September 22, 2021, for the very first time, ESSA's coverage counsel sent a letter providing notice of a Claim under the 2014 Excess Policy to Travelers claim department. (Def. SUMF at ¶ 52.) In the letter, ESSA asserted that Chubb acknowledged coverage for the Edmondson and Wilson Actions, and the Excess Policy followed form[3] to Chubb's Primary Policy. As such, ESSA sought Travelers' acknowledgement of excess coverage for these actions. (Def. SUMF at ¶ 52.) In October 2021, Travelers responded to the letter reiterating that coverage would be declined under both the 2014 and 2015 Excess Policy because notice was provided to the Travelers claim department after the policy expired. (Def. SUMF at ¶ 55.) Specifically for the 2014 Excess Policy, ESSA never provided direct notice to Travelers claim department in accordance with Section 6 of Travelers Excess Policy concerning the Fangman Action. Rather, ESSA only provided notice to Chubb regarding the 2014 Claim. (Def. SUMF at ¶ 60.)

In January 2022, ESSA and its coverage counsel sent a letter to Travelers demanding information on whether Travelers received notice of the Fangman Action and if their coverage denials of the Edmonson and Wilson actions were based on an absence of notice for the Fangman Action. (Def. SUMF at ¶ 60.) During this time, ESSA reached out to McGriff, its insurance broker, to determine if notice of the Fangman Action was submitted to Travelers in the same way it was submitted to Chubb. He confirmed no notice had been sent to Travelers claim department. (Def. SUMF at ¶ 60.) Coverage counsel for ESSA, sought clarification from Travelers regarding the policy language that required notice of the earlier claim with regard to relating back to later claims. (*Id*. at ¶ 61.)

---

[3] Followed form coverage is an insurance policy image of another policy. This type of coverage is typically used to supplement a primary policy with additional coverage for specific risk that may not be included in the primary policy.

Travelers responded to this letter in March 2022, emphasizing that the Excess Policy required separate notice of "Claims" which should have been submitted to the Travelers claim department at the address specified in the Declarations. (Def. SUMF at ¶ 62.) Such notice was never provided. In the later months, Travelers claimed that they received a reference to the Fangman Action in the materials needed for the renewal of the 2015 Excess Policy. (Def. SUMF at ¶ 65.) ESSA alleges that one of these documents – the Incident Reporting document – constituted legally sufficient notice. ESSA asserts that Travelers intentionally withheld the Incident Reporting document. (Plaintiff's Res. In Opp. to Def. SUMF ¶ 65.) It is undetermined if this document was deliberately concealed, but there is evidence suggesting that Ms. Ringgenberg first discovered this document in February 2022. Regardless, discovery of this document did not establish that appropriate notice had been provided to Traveler's Claim department, as provided in the policy language. (Consolidated Exhibits in Supp. Of Plaintiff's Mot. for SJ, Exhibit 12, ECF no. 25). Currently, the Edmonson and Wilson Actions are still ongoing, but the Plaintiff was dismissed from the Fangman Action in May 2016. (Def. SUMF at ¶ 67.)

### III.   LEGAL STANDARD

Summary judgment is appropriate if the movant shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *Liberty Mut. Ins. Co. v. Sweeney*, 689 F.3d 288, 292 (3d Cir. 2012). To defeat a motion for summary judgment, there must be a factual dispute that is both material and genuine. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 24-49 (1986); *Dee v. Borough of Dunmore*, 549 F.3d 225, 229 (3d Cir. 2008). A material fact is one that "might affect the outcome of the suit under the governing law". *Anderson*, 477 U.S. at 248. A dispute over a material fact is

"genuine" if, based on the evidence, "a reasonable jury could return a verdict for the nonmoving party." *Id*.

The movant bears the initial burden of demonstrating the absence of a genuine dispute of a material fact. *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016). When the movant is the defendant, they have the burden of demonstrating that the plaintiff "has failed to establish one or more essential elements of her case." *Burton v. Teleflex Inc.,* 707 F.3d 417, 425 (3d Cir. 2013). If the movant sustains their initial burden, "the burden shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (internal quotations omitted) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At the summary judgment stage, the court's role is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249; *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007). In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party. *See Horsehead Indus., Inc. v. Paramount Commc'ns, Inc.*, 258 F.3d 132, 140 (3d Cir. 2001). Nonetheless, the court must be mindful that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

The interpretation of an insurance contract is a question of law. *J.C. Penney Life Ins. Co. v. Pilosi*, 393 F.3d 356, 360 (3d Cir. 2004). "A court must interpret the plain language of the insurance contract read in its entirety, giving effect to all its provisions." *Am. Auto. Ins. Co. v. Murray*, 658 F.3d 311, 320 (3d Cir. 2011). When an insurance policy's language is clear and

unambiguous, a court must enforce that language. *Med. Protective Co. v. Watkins*, 198 F.3d 100, 103 (3d Cir. 1999). If the policy's language is ambiguous, it may be construed in favor of the insured. Ambiguity exists when the policy is susceptible to more than one construction and meaning. *Newchops Rest. Comcast LLC v. Admiral Indem. Co.*, 507 F. Supp. 3d 616, 621 (E.D. Pa. 2020). Disagreement of a policy's meaning does not equate to ambiguity. In most cases, the parties' reasonable expectations are best evidenced by the language of the insurance policy. *Prudential Prop. & Cas. Ins. Co. v. Hinson*, 277 F. Supp. 2d 468, 476 (E.D. Pa. 2003). However, policy language may not be stretched beyond its plain meaning to create an ambiguity. *Meyer v. CUNA Mut. Ins. Soc.*, 648 F.3d 154, 164 (3d Cir. 2011).

## IV. DISCUSSION

In Count I of the Complaint, Plaintiffs seek a declaration of insurance coverage under the Excess BPL coverage for the 2014-2015 year as to the two pending lawsuits (the Edmonson and Wilson actions). Plaintiffs allege that this coverage was based on the relation back to the earliest of such claims; the Fangman Action. Plaintiffs seek judgment against Defendants on Count II of the Complaint for engaging in bad faith insurance practices for denial of coverage for the Edmonson and Wilson actions. As Plaintiffs have brought this action pursuant to the Eastern District of Pennsylvania's diversity jurisdiction, 28 U.S.C. § 1332, the Court will consider these claims under Pennsylvania law. This Court finds that the Plaintiffs did not demonstrate its right to excess coverage for the Edmonson and Wilson lawsuits, nor did they prove that the Defendant acted in bad faith.

### A. Notice Requirements Under the 2014 Excess Policy

Insurance contracts may take two forms: "claims made" and "occurrence" policies. Claims made policies cover claims that are made within the policy period, regardless of when the

triggering event occurred. In contrast, occurrence policies protect insureds for events that take place during the policy period, irrespective of when the claim is submitted. *Pizzini v. Am. Int'l Specialty Lines, Inc.*, 210 F. Supp. 2d 658, 668 (E.D. Pa. 2002). "Failure to comply with the reporting provision of a 'claims made' policy precludes coverage." *Id*. Courts have recognized claims made insurance policies as coverage that is bargained for exchange where the insurer receives the benefit of a clear cutoff date for coverage and in return, the insured will often pay a lower premium. *Id*. The Eastern District has previously held that notice requirements for claims made insurance policies are strictly construed. *Westport Ins. Corp. v. Mirsky*, No. 00-4367, 2002 U.S. Dist. LEXIS 16967, at *10 (E.D. Pa. Sep. 10, 2002).

The terms of the 2014 Excess Policy are clear and unambiguous, with a straightforward claims made notice provision. The policy required that any claims must be reported in writing to Traveler's Claims Department no later than 180 days after the expiration of the policy pursuant to the required specifications in Item 9 of the Declaration. The policy was written to cover "only Claims first made during the Policy Period or, if exercised, any extended discovery period." (Def. SUMF ¶ 9.) The Excess Policy only provided coverage for any Claim "first made" during the applicable May 28, 2014, to May 28, 2015, Policy Period. (Def. SUMF ¶¶ 9-13.) The Traveler's Excess Policy also contained a "Related Claims" provision which provides coverage for lawsuits arising from the same or related facts, or the same or related series of facts. The Provision specifically stated: "all Related Claims shall be treated as a single Claim first made on the date the earliest of such Related Claims was first made . . . regardless of whether such date is before or during the Policy Period." (Def. SUMF ¶ 9.)

Here, ESSA accepted service of the Fangman Action in 2015, and shortly thereafter, instructed its insurance broker, McGriff, to analyze what coverage options were available.

McGriff provided notice to the Chubb's claim department, but not to Travelers. ESSA failed to provide any notice to Travelers' Claims department in accordance with Item 9 of the Policy Declarations. Each insurance company is a separate and distinct entity and has its own specific notice requirements. Notifying a primary insurer does not fulfill the obligation of notifying the excess insurance carrier. ESSA never fulfilled Traveler's requirement of providing separate notice of any Claim first made during the Policy Period directly to Travelers' claim department within the prescribed timeframe, in this case – November 24, 2015. The absence of formal notice is further evidenced by the testimony of ESSA's insurance broker, McGriff, who confirmed that he was unaware of any notice that was provided to Travelers of the Fangman Action during the Policy Period in accordance with the requirements of Item 9 of the Declarations. (Def. SUMF ¶ 60.)

### B. Coverage for the Edmondson and Wilson Actions

ESSA provided notice of the Edmonson action to Travelers in June 2020, after being served in 2016. *Edmondson v. Eagle Nat'l Bank*, No. RDB-16-3938, ECF No. 3. On June 11, 2020, ESSA provided notice to the Chubb claim department of the Wilson Action. (DSUMF ¶ 39.) The Edmondson and Wilson Actions relate back to the Fangman Action and are treated as a claim first made during the 2014 – 2015 policy. Accordingly, ESSA's failure to provide notice of the Fangman Action in 2015 is determinative of coverage.

Courts have interpreted how relation back provisions in claims made policies should be construed. Most notably, the Sixth Circuit addressed the issue of whether or not claims made outside the policy period should "relate – back" to claims first made within the policy period. In *United States v. A.C. Strip*, the Sixth Circuit expressed that failure to comply with unambiguous notice provisions prevents coverage for relation back provisions. *United States v. A.C. Strip*, 868

F.2d 181, 184 (6th Cir. 1989). ESSA's attempt at providing prior notice to the Traveler's claim department in 2017 for the Edmonson Action, or in 2020 for the Wilson Action, were insufficient to account for the lack of prior notice earlier. This determination was further supported by a Fifth Circuit holding that the insured did not qualify for coverage of a related claim reported during the 2000 claims-made policy period because they failed to notify about a claim first made during the 1998 claims-made policy period. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Willis*, 296 F.3d 336, 343 (5th Cir. 2002). Similar to the issue here, since the claim in question was first made in 1998 and was not reported in a timely manner as stipulated by the policy, coverage was denied. *Id*.

Pursuant to Pennsylvania case law, this Court has determined the notice provision in the Excess Policy to be clear and unambiguous. The Edmondson and Wilson Actions relate back to the Fangman Action and are regarded as a Claim first made in early 2015 during the 2014-15 Policy Period. (*Id*. at ¶¶ 9-11.). Despite the relation back policy, the notice requirements remain unchanged. In order to sufficiently provide notice, ESSA needed to comply with the notice provisions of the claims made policy. The policy did not offer any means for the insured to eliminate the effects of earlier inaction through actions taken years later.

ESSA provided notice to the Traveler's claim department of the Edmonson and Wilson Actions in 2017 and 2020 respectively. ESSA's late attempt at correctly providing notice of the Wilson Action to the Travelers' claim department does not override the previous inaction of the Fangman Action due to the nature of a relation back claim. The insured bears the responsibility for thoroughly reviewing the Policy requirements and giving notice accordingly. Insurance companies do not have a duty to provide coverage for clients that simply failed to perceive the magnitude of the risk and exceeded their coverage limits. Therefore, ESSA may not seek

coverage for the Edmonson and Wilson Actions since the notices in 2017 and 2020 are untimely under the 2014 Excess Policy. The fact that the Plaintiff failed to provide notice for the Fangman Action was determinative of coverage for the Edmonson and Wilson Actions.

### C. Documents provided during the 2015 Renewal Process was Improper Notice

In the Complaint, ESSA alleged that actual notice was given to Travelers through submission of the Incident Reporting document. (Plaintiff's Motion for Summary Judgment re coverage, p.2, ECF No. 23) Travelers alleges that this report was provided to them amongst other underwriting files during the 2015 Excess Policy Renewal. (Def. SUMF at ¶ 65.) They further contend that providing this report did not constitute notice because ESSA failed to comply with the notice and reporting requirements of the 2014-15 Policy. We agree.

The Third Circuit has analyzed this very issue holding that renewal applications do not constitute a formal claim or notice. The Circuit explained that: "although the renewal applications were in writing, the insureds were properly denied coverage because they failed to strictly comply with the reporting requirements of its claims-made policy. The renewal application was not a formal claim." *Atl. Health Sys. v. Nat'l Union Fire Ins. Co.*, 463 F. App'x 162, 168 (3d Cir. 2012). They further affirmed that notice of claims must be provided to the address specified by the insurer. *Id*. at 167. The Minnesota District Court similarly held that providing notice to a different department instead of the claims department was insufficient for appropriate notice of a claim, as it failed to comply with the specified instructions in the claims made and reported policy. *UnitedHealth Grp. Inc. v. Columbia Cas. Co.*, 941 F. Supp. 2d 1029, 1052 (D. Minn. 2013).

The Third Circuit's holding is applicable in this case, given the similarities in circumstances presented. ESSA's tendering of a Report during the Renewal Process did not meet

the requirements constituting notice under the Policy. There is no evidence that ESSA submitted this Report pursuant to the Policy provisions of providing notice to the Travelers Claims department during the applicable time period. ESSA's failure to fulfill the requirements of providing notice of the Fangman Action in accordance with the Policy bars their ability to seek coverage for the Edmonson and Wilson Actions.

### D. Statutory Bad Faith Claim

Pursuant to Pennsylvania law, § 8371 provides a statutory remedy for insurers acting in bad faith towards the insured. 42 Pa. Code § 8371. In making out a claim under § 8371, plaintiffs must show that "(1) the insurer did not have a reasonable basis for denying benefits under the relevant policy, and (2) the insurer knew or recklessly disregarded its lack of a reasonable basis in denying the insured's claim." *Rancosky v. Washington Nat'l Ins. Co.*, 170 A.3d 364, 369 (Pa. 2017). Bad faith may also be demonstrated by lack of investigation into the facts of a claim or a failure to communicate with a claimant. *Bussie v. Am. Sec. Ins. Co.*, No. 20-3519, 2021 U.S. Dist. LEXIS 102303, 2021 WL 2206282, at *6 (E.D. Pa. June 1, 2021). "Where the sole basis for a bad-faith claim is the denial of coverage, there can be no bad-faith claim if the insurer was correct as a matter of law in denying coverage." *Cozza ex rel. Cozza v. State Farm Fire and Cas. Co.*, 440 F. App'x 73, 75-76 (3d Cir. 2011). Likewise, the Third Circuit affirmed granting summary judgment for the insurer after finding that the defendant's bad faith claim inevitably failed with the determination that the insurer correctly concluded that there was no potential coverage under the policy. *USX Corp. v. Liberty Mut. Ins. Co.*, 444 F.3d 192, 202 (3d Cir. 2006).

A plaintiff must prove both the elements of its claim by clear and convincing evidence. *Klinger v. State Farm Mut. Auto. Ins. Co.*, 115 F.3d 230, 233 (3d Cir. 1997). This standard requires the plaintiff to produce evidence "so clear, direct, weighty and convincing as to enable a

clear conviction, without hesitation, about whether or not the defendants acted in bad faith." *Nw. Mut. Life Ins. Co. v. Babayan*, 430 F.3d 121, 137 (3d Cir. Nov. 30, 2005). Bad faith encompasses "[a]ny frivolous or unfounded refusal to pay proceeds of a policy," though "mere negligence or bad judgment is not bad faith." *Terletsky v. Prudential Property & Cas. Ins. Co.,* 437 Pa. Super. 108, 649 A.2d 680, 688 (Pa Super. Ct. 1994).

ESSA argues that Travelers engaged in "purposeful stratagem" by concealing a report that served as notice of the Fangman Action to Travelers. They further allege that the confusion exhibited by Traveler's assigned claims handler, Jessica Ringgenberg, concerning the relation back issue of the Fangman Action during her deposition, reflected a lack of attention. ESSA contends this oversight indicated disregard for information provided by the insured regarding coverage. Travelers asserts that they correctly denied coverage pursuant to the 2014 Excess Policy requirements. We have already determined that Travelers had a reasonable basis for denying coverage. ESSA's failure to abide by the specifications in the policy bars coverage for the Fangman Action as well as the Edmonson and Wilson Actions, based on the relation back principle. Given the facts presented, this claim fails.

E.  **Common Law Bad Faith Claim**

Common law bad faith claims are analyzed based on "whether the insurer acted 'negligently or unreasonably' in handling the insurance claim." *DeWalt v. Ohio Cas. Ins. Co.*, 513 F. Supp. 2d 287, 297 (E.D. Pa. 2007). "If an insurer breaches the contractual duty of good faith, the insured is entitled to recover 'the known and/or foreseeable compensatory damages of its insured that reasonably flow from the bad faith conduct of the insurer.'" *Wolfe v. Allstate Prop. & Cas. Ins. Co.*, 790 F.3d 487, 497 (3d Cir. 2015) (*quoting Birth Ctr. v. St. Paul Cos.*, 567 Pa. 386, 787 A.2d 376, 379 (2001)). A bad faith claim at common law must be proven by clear

and convincing evidence. *Cowden v. Aetna Cas. & Sur. Co.*, 134 A.2d 223, 229 (Pa. 1957). Eastern District jurists have held that an "insurer's delay may constitute bad faith if it is unreasonable or the result of negligence." *Dewalt*, 513 F. Supp. 2d 287 at 300. "An insurer's action is unreasonable or negligent when it is not based on a thorough, honest and objective consideration of all the relevant factors." *Leporace v. N.Y. Life & Annuity Corp.*, Civil No. 11–2000, 2014 WL 3887726, at *1 (E.D. Pa. Aug. 7, 2014). Insurance companies are not required to show "the process used to reach its conclusion was flawless or that its investigatory methods eliminated possibilities at odds with its conclusion." *Mann v. UNUM Life Ins. Co. of Am.*, No. 02–1346, 2003 WL 22917545, at *7 (E.D. Pa. Nov. 25, 2003).

In their Motion for Summary Judgment, ESSA argues that Travelers engaged in misrepresentations and concealments in an attempt to evade liability. (Plaintiff's Motion for Summary Judgment on Bad Faith Claim, ECF No. 24). The Plaintiff has alleged conclusory statements that erroneously characterize Ms. Ringgenberg, as having failed to conduct a thorough investigation as to any potential coverage for the Fangman Action and any subsequent coverage for the Edmonson and Wilson Actions. (Consolidated Exhibits in Supp. Of Plaintiff's Mot. for SJ, Exhibit 9, ECF No. 25.) However, a review of the testimony of Mr. Muto – the Vice President and CFO, and Ms. Ringgenberg, reveal that there was no duplicity on the part of Travelers. In fact, Ms. Ringgenberg carefully put together an entire timeline accounting for the specific communications that took place between Travelers and ESSA. (Consolidated Exhibits in Supp. Of Plaintiff's Mot. for SJ, Exhibit 9, ECF No. 25.) Ms. Ringgenberg's testimony reflects her confusion regarding the relevance of the Fangman Action and its connection to coverage for the Edmonson and Wilson Actions. Nonetheless, despite displaying some confusion, on the relation back issue, proper notice was never provided to Travelers in accordance with the Excess

Policy requirements for the Fangman Action. In 2022, ESSA consulted with their insurance broker, McGriff, to verify if notice of the Fangman Action was provided to Travelers in the same way and time as it was provided to Chubb. He confirmed no notice was provided. (Def. SUMF ¶ 60.) We do not find that the Plaintiff has met its burden in proving by clear and convincing evidence that the Defendant actions were unreasonable or the result of negligence.

The Plaintiff's assertions that Ms. Ringgenberg's deposition statements were unclear do not imply that she failed to conduct an investigation. Travelers has provided all pertinent information related to the Fangman Action to ESSA. The Plaintiff has failed to put forth any indica of evidence supporting a common law claim for bad faith, and accordingly, this must be dismissed.

### V.  CONCLUSION

For the foregoing reasons, Defendant Traveler's Motion for Summary Judgment on Counts I and II of the Complaint are granted, and the Plaintiff's Motion for Summary Judgment is denied.

An appropriate Order follows.

**IT IS SO ORDERED.**

                                                        BY THE COURT:

                                                        /s/ John Milton Younge
                                                        **Judge John Milton Younge**